Taras Kick, CA Bar No. 143379
Taras@kicklawfirm.com
**THE KICK LAW FIRM, APC**
815 Moraga Drive
Los Angeles, California 90049
Tel: (310) 395-2988 Fax: (310) 395-2088

Kevin P. Roddy, CA Bar No. 128283
kroddy@wilentz.com
**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Tel:  (732) 636-8000 Fax:  (732) 726-6686

Jeffrey D. Kaliel, CA Bar No. 238293
jkaliel@kalielpllc.com
**KALIEL PLLC**
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
Telephone: (202) 350-4783

Attorneys for Plaintiff Sylvia Varga and the Putative Class

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVIA VARGA, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN AIRLINES FEDERAL CREDIT UNION, and DOES 1-100,<br><br>Defendants. | **CASE NO.: 2:20-CV-4380**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR**<br><br>(1) Breach of Contract;<br>(2) Breach of the Implied Covenant of Good Faith and Fair Dealing;<br>(3) Unjust Enrichment/Restitution;<br>(4) Money Had and Received<br>(5) Violation Of the Electronic Fund Transfers Act; and,<br>(6) Violation of the Unfair Competition Laws, Bus.& Prof. Code §17200, *et seq*. |

-1-

Plaintiff Sylvia Varga ("Plaintiff"), by and through her attorneys, hereby brings this class and representative action against American Airlines Federal Credit Union and DOES 1 through 100 (collectively "AAFCU" or "Defendant").

## NATURE OF THE ACTION

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff's or her counsel's personal knowledge, as well as Plaintiff's or her counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class and representative action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all other persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public.  AAFCU wrongfully charged Plaintiff and the Class Members fees related to their checking accounts.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, AAFCU's policy and practice to maximize the fees it imposes on members.  The conduct has the overwhelming common denominator of breaching its members' contracts and violating laws so as to maximize AAFCU's fee income. This conduct includes but is not limited to, assessing an overdraft fee or NSF fee on transactions when by Defendant's own calculations there was enough available money in the checking account to cover the transaction at issue when authorized and the money was specifically sequestered for that transaction but would be assessed an overdraft fee anyway; imposing more than one NSF fee, or an NSF fee followed by overdraft fee, on the *same* electronic item or check; charging its members for transferring money from the savings account to the checking account when there was

CLASS ACTION: COMPLAINT

no negative balance, or should not have been a negative balance, to avoid in the checking account; violating its own Funds Availability Policy ("FAP") in a manner which increased fees imposed on members; and, charging for fees not authorized or appropriately disclosed. The charging of such fees breaches AAFCU's contracts with its members, who include Plaintiff and the members of the Class.

4.      The charging for such fees also violates federal law.  AAFCU failed to follow basic prerequisites in its overdraft fee system as required by Regulation E (12 C.F.R. §§1005.17 *et seq*.) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq*.), which include, *inter alia*, providing a separate overdraft fee contract that describes the actual overdraft and non-sufficient funds practice used by AAFCU, which may be rejected by the customer, and only collecting fees in the manner described by the fee contract.  Regulation E prohibits AAFCU from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)) if it does not meet the Regulation E prerequisites, but AAFCU did charge overdraft fees without meeting the Regulation E prerequisite.  Further, AAFCU violated Regulation E by, *inter alia*, offering incentives to opt in which were not offered to those who did not opt, or, by not abiding by its Opt-In Contract terms.

## PARTIES

5.      Plaintiff Sylvia Varga is a resident of Marina del Rey, California and had a checking account with AAFCU at all times relevant to the class action allegations.

6.      Based on information and belief, Defendant AAFCU is and has been a federally chartered credit union with its headquarters located in Fort Worth, Texas. AAFCU has assets of more than $7.7 billion, over 310,000 members, and 47 branches in 13 states and the District of Columbia.  AAFCU is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

7.      Without limitation, defendants DOES 1 through 100, include agents,

CLASS ACTION: COMPLAINT

1   partners, joint ventures, subsidiaries and/or affiliates of AAFCU and, upon

2   information and belief, also own and/or operate AAFCU branch locations.  Each of

3   defendants DOES 1 through 100 is a "financial institution" within the meaning of

4   Regulation E (12 C.F.R. § 1005.2(i)).  As used herein, where appropriate, the term

5   "AAFCU" is also inclusive of Defendants DOES 1 through 100.

6   8.   Plaintiff is unaware of the true names of defendants DOES 1 through

7   100.  Defendants DOES 1 through 100 are thus sued by fictitious names, and the

8   pleadings will be amended as necessary to obtain relief against defendants DOES 1

9   through 100 when the true names are ascertained, or as permitted by law or by the

10   Court.

11   9.   There exists, and at all times herein mentioned existed, a unity of interest

12   and ownership between the named defendants (including DOES) such that any

13   corporate individuality and separateness between the named defendants has ceased,

14   and that the named defendants are *alter egos* in that the named defendants effectively

15   operate as a single enterprise, or are mere instrumentalities of one another.

16   10.   At all material times herein, each defendant was the agent, servant, co-

17   conspirator and/or employer of each of the remaining defendants, acted within the

18   purpose, scope, and course of said agency, service, conspiracy and/or employment

19   and with the express and/or implied knowledge, permission, and consent of the

20   remaining defendants, and ratified and approved the acts of the other defendants.

21   However, each of these allegations are deemed alternative theories whenever not

22   doing so would result in a contradiction with the other allegations.

23   11.   Whenever reference is made in this Complaint to any act, deed, or

24   conduct of Defendant, the allegation means that Defendant engaged in the act, deed,

25   or conduct by or through one or more of its officers, directors, agents, employees, or

26   representatives who was actively engaged in the management, direction, control, or

27   transaction of Defendant's ordinary business and affairs.

28

-4-

CLASS ACTION: COMPLAINT

12.     As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

13.     This Court has subject matter jurisdiction over this case, among other reasons, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332(d).

14.     Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

15.     AAFCU offers its consumer banking customers a checking account. One of the features of an AAFCU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of an AAFCU checking account include the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

16.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), AAFCU assesses what it calls "Withdrawal NSF Fee;" "Withdrawal Transfer Fee;" and "Withdrawal Paid NSF." As alleged further below, these fees either were not at all permitted to be charged by any AAFCU contract during the class periods, or were charged in breach of the contracts, or were charged without required predicate compliance with law.

17.     Overdraft fees and Nonsufficient Funds fees ("NSF fees") constitute the primary fee generators for banks and credit unions.  According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees.  While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions

are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as AAFCU, overdraft fees and NSF fees are a major source of revenue and a profit center.

18.    Since 2000, the average dollar amount of a checking account transaction has become much lower because customers, and especially younger customers, use debit cards instead of cash or credit cards for everyday purchases.   In 2016, the number of terminals that accept debit cards in the United States had increased by approximately 1.4 million compared to 2011.[1]   That has translated to the average dollar amount of overdraft transactions being lower than in 2000.  However, while the average overdraft transaction is substantially lower and provides much less risk and exposure to the bank, the average cost of overdraft fees per transaction has gone up.

19.    The high cost of an overdraft fee is also usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

20.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25-

---

[1] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23 (last visited March 7, 2019).

CLASS ACTION: COMPLAINT

year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. (*Id.* at p. 3). More than 50% of the customers assessed overdraft fees earned under $40,000 per year. (*Id.* at p. 4). Non-whites are 83% more likely to pay an overdraft fee than whites. (*Id.* at p. 3).

21.     As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The rulings of these cases have predominantly fallen in favor of consumers, forcing the banks and credit unions to repay their customers significant amounts of wrongfully collected overdraft fees.

22.     The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")). On information and belief, AAFCU calls its Regulation E program "Bounce Protection Plus."

23.     To qualify as affirmative consent for the Regulation E program, the Opt-In Contract must include, but is not limited, to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that can be assessed on any given day (if there is no maximum, that fact must be stated);
- The financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available.

-7-

- • The opt-in consent must be obtained separately from other consents and acknowledgements;
- • The consent cannot serve any purpose other than opting into the overdraft program;
- • The consent cannot be a pre-selected checked box;
- • The financial institution may not provide different terms for the account depending on whether the customer opted-in to the overdraft program.

24.    If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, including fulfilling each of the above requirements, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.  On information and belief, although formal discovery will be required to confirm this, AAFCU did not fulfill these Regulation E prerequisites. The requirements which it did not fulfill, on information and belief, include, *inter alia*, in its actual Bounce Protection Plus Contract document, failing to correctly describe the program pursuant to which AAFCU actually assessed these overdraft fees, failing to abide by its terms, and also using it as an impermissible marketing vehicle.

25.    An accounting gimmick related to increasing overdraft and NSF fees used by some financial institutions, which on information and belief financial institutions such as Defendant may use, is an "approve positive – post negative" ("APPN") method of calculation. It works as follows. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, AAFCU immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds available

1   to cover these transactions.

2        26.     However, AAFCU still assesses $25 overdraft fees on many of these

3   transactions and mispresents its practices in its account documents. Despite putting

4   aside sufficient available funds for debit card transactions at the time those

5   transactions are authorized, AAFCU later assesses overdraft fees on those same

6   transactions when they purportedly settle days later into a negative balance.  These

7   types of transactions are APPN Transactions.

8        27.     AAFCU maintains a running account balance in real time, tracking funds

9   consumers have for immediate use.  This running account balance is adjusted, in real-

10  time, to account for debit card transactions at the precise instance they are made.

11  When a customer makes a purchase with a debit card, AAFCU subtracts the dollar

12  amount of the transaction from the customer's available balance and places such

13  funds on a hold.  Such funds are not available for any other use by the accountholder,

14  and such funds are specifically associated with a given debit card transaction.

15       28.     That means when any *subsequent*, intervening transactions are initiated

16  on a checking account, they are compared against an account balance that has already

17  been reduced to account for any earlier debit card transactions.  Accordingly, many

18  subsequent transactions incur overdraft fees due to the unavailability of the funds

19  sequestered for those debit card transactions.

20       29.     Still, despite keeping those held funds off-limits for other transactions,

21  AAFCU improperly charges overdraft fees on those APPN Transactions, although the

22  APPN Transactions **always** have sufficient available funds to be covered.

23       30.     The Consumer Financial Protection Bureau in its Consumer Financial

24  Protection Bureau, Winter 2015 "Supervisory Highlights" has expressed concern with

25  this very issue, calling the practice "unfair" and/or "deceptive" when:

26            A financial institution authorized an electronic transaction, which reduced a

27            customer's available balance but did not result in an overdraft at the time of

28            authorization; settlement of a subsequent unrelated transaction that further

CLASS ACTION: COMPLAINT

lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.  Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above.  Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged.  Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions.  Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status.  But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures.  Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

31.    There is no justification for these practices, other than to maximize AAFCU's overdraft fee revenue.  APPN transactions only exist because intervening checking account transactions supposedly reduce an account balance.  But AAFCU is free to protect its interests and either reject those intervening transactions or charge overdraft fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.  But AAFCU was not content with these millions in overdraft fees. Instead, it sought millions *more* in overdraft fees on these APPN

CLASS ACTION: COMPLAINT

1    Transactions.

2        32.    Besides being deceptive, unfair, and unconscionable, these practices

3    breach contract promises made in AAFCU's adhesion contracts—contracts which

4    fundamentally misconstrue and mislead consumers about the true nature of AAFCU's

5    processes and practices. These practices also exploit contractual discretion to gouge

6    consumers. In short, AAFCU is not authorized by contract to charge overdraft fees on

7    transactions that have not overdrawn an account, but it has done so and continues to

8    do so.

9        **Mechanics of a Debit Card Transaction**

10        33.    A debit card transaction occurs in two parts. First, authorization for the

11    purchase amount is instantaneously obtained by the merchant from AAFCU. When a

12    merchant physically or virtually "swipes" a customer's debit card, the card terminal

13    connects, via an intermediary, to AAFCU, which verifies that the customer's account

14    is valid and that sufficient available funds exist to "cover" the transaction amount.

15        34.    At this step, if the transaction is approved, AAFCU immediately reduces

16    the funds in a consumer's account and sequesters funds in the amount of the

17    transaction but does not yet transfer the funds to the merchant.

18        35.    Indeed, the entire purpose of the immediate debit and hold of positive

19    funds is to ensure that there are enough funds in the account to pay the transaction

20    when it settles, as discussed in the Federal Register notice announcing revisions to

21    certain provisions of the Truth in Lending Act regulations: "When a consumer uses a

22    debit card to make a purchase, a hold may be placed on funds in the consumer's

23    account to ensure that the consumer has sufficient funds in the account when the

24    transaction is presented for settlement. This is commonly referred to as a "debit

25    hold." During the time the debit hold remains in place, which may be up to three days

26    after authorization, those funds may be unavailable for the consumer's use for other

27    transactions." Federal Reserve Board, Office of Thrift Supervision, and National

28

Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01
(Jan. 25, 2009).

36.    Sometime thereafter, the funds are actually transferred from the
customer's account to the merchant's account.  AAFCU decides whether to "pay"
debit card transactions at authorization.  If it decides to pay, after that, AAFCU is
obligated to pay the transaction no matter what.  For debit card transactions, that
moment of decision can only occur at the point of sale, at the instant the transaction is
authorized or declined.  It is at that point—and only that point—when AAFCU may
choose to either pay the transaction or decline it. When the time comes to actually
settle the transaction, it is too late—the credit union has no discretion and must pay
the charge. This "must pay" rule applies industry wide and requires that, once a
financial institution authorizes a debit card transaction, it "must pay" it when the
merchant later makes a demand, regardless of other account activity. See Electronic
Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).  Notably, there is no
change—***no impact whatsoever***—to the available funds in an account when this step
occurs.

**AAFCU's  Account Contract**

37.    Ms. Varga has an AAFCU checking account, which is currently
governed by AAFCU's  Account Agreement.  The Account Agreement and relevant
contract documents covering overdraft fees provide that AAFCU will not charge
overdraft fees on transactions that have sufficient funds to cover them at the time they
are initiated.

38.    For debit card transactions, this moment occurs at the moment of
authorization.  For APPN Transactions, which are immediately deducted from a
positive account balance and held aside for payment of that same transaction, there
are always funds to cover those transactions—yet AAFCU assesses overdraft fees on
them anyway.

-12-

39.    The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPN transactions. In fact, AAFCU actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses the secret posting process described below.

40.    AAFCU charges overdraft fees even when sufficient funds exist to cover transactions that are "initiated and authorized" into a positive balance. No express language in any document states that AAFCU may impose overdraft fees on any APPN Transactions.

41.    The account documents misconstrue AAFCU's true debit card processing and overdraft practices. First, and most fundamentally, AAFCU charges overdraft fees on debit card transactions for which there are sufficient funds available to use to cover the transactions.

42.    AAFCU assesses overdraft fees on APPN Transactions that **do** have sufficient funds available to cover them throughout their lifecycle. AAFCU's practice of charging overdraft fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between AAFCU's actual practice and the contract causes consumers like Ms. Varga to incur more overdraft fees than they should.

43.    Sufficient funds for APPN Transactions are actually debited from the account immediately, consistent with standard industry practice. These withdrawals take place upon initiation and thus they cannot be re-debited later. But that is what AAFCU does when it re-debits the account during a secret batching posting process.

44.    In reality, AAFCU's actual practice is to attempt the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement. At the time of

settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, AAFCU cannot then charge an OD fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

45.    Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, AAFCU does something new and unexpected, during the middle of the night, during its nightly batch posting process.  Specifically, AAFCU releases the hold placed on funds for the transaction for a split second, putting money back into the account, and then re-debits the same transaction a second time.

46.    This secret step allows it to charge overdraft fees on transactions that never should have been subject to them—transactions that were authorized into sufficient funds, and for which AAFCU specifically set aside money to pay them. This discrepancy between AAFCU's  actual practices and the contract causes accountholders to incur more overdraft fees than they should. In sum, there is a huge gap between AAFCU's  practices as described in the account documents and AAFCU's  practices in reality.

47.    The assessment of overdraft fees on APPN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions.  That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPN Transactions).  If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

48.    AAFCU was and is aware that this is precisely how its members reasonably understand debit card transactions to work.  AAFCU knows that many consumers prefer debit cards for these very reasons.  Consumer research indicates that consumers prefer debit cards as a budgeting device because they do not allow

-14-

CLASS ACTION: COMPLAINT

1    debt like credit cards do.

2        49.    On information and belief, although access to Defendant's database will

3    be sought by Plaintiff to confirm, Plaintiff was charged such inappropriate APPN fees

4    at least on the following occasions. On July 19, when payments of a $14.25 and a $15

5    and a $58.60 were already posted and then a $1.98 payment which previously had

6    been authorized was then posted, and a fee of $25 on that $1.98 was imposed by

7    AAFCU.  Additionally, on information and belief, two charges which posted on July

8    20, 2019, one for $2 and one for $9.31, but had both been authorized on July 19, and

9    both of which had a $25 fee each assessed on them.  Additionally, on August 7, 2019,

10   when a debit posted which had been authorized on August 6, 2019, for $13.79.

11   Additionally, a transaction which posted on August 8, 2019, for $19.14 and was

12   assessed a $25 fee, but had been authorized on August 5, 2019. This transaction also

13   caused an unnecessary $5 sweep fee as it had, on information and belief, been

14   authorized positive yet was being treated as if negative and causing an unnecessary

15   $5 sweep fee. Additionally, a charge of $15.72 which posted on August 27 was

16   assessed a $25 overdraft fee, but had been authorized on August 25, 2019.

17       50.    AAFCU has no authority to use an APPN calculation to assess overdraft

18   and NSF fees in its contract with its customers, and such practices breach its contracts

19   with its customers and are also deceptive, unfair, and unconscionable.  These

20   practices exploit any contractual discretion AAFCU may have in its contracts with its

21   customers in an unreasonable way that adds to AAFCU's profits and harms its

22   customers. American Airlines does not describe this APPN procedure in its contracts.

23   Instead, on page 5 of its Account Agreement, AAFCU states as follows:

24   "Overdrawing" your Account means that there are not sufficient available funds in

25   your Account to pay for a transaction, but we pay the transaction anyway."

26       51.    Page 6 of the Account Agreement also expressly informs accountholders

27   that "authorization holds" are immediately placed on debit card transactions, and that

28

CLASS ACTION: COMPLAINT

such holds can cause OD or NSF Fees for other, later transactions:

> Your available balance is the amount of money in your Account that is
> available to you to use without incurring an overdraft fee. The available
> balance takes into account factors such as holds placed on deposits and pending
> transactions (such as pending Debit card purchases) that the Credit Union has
> authorized but that have not yet posted to your Account. For example, assume
> you have an actual balance of $50 and an available balance of $50. If you were
> to use your Debit card at a restaurant to buy lunch for $20, then that merchant
> could ask us to pre-authorize the payment in that amount (or even a different
> amount). Under this example, if the merchant requested preauthorization in the
> amount of $20, we will place a "hold" on your Account for $20 (referred to as
> an "authorization hold"). Your actual balance would still be $50 because this
> transaction has not yet posted, but your available balance would be $30
> because of the restaurant's preauthorization request that resulted in an
> authorization hold on $20 in your Account. When the restaurant submits its bill
> for payment (which could be a few days later and for a different amount than
> the amount of the authorization hold), we will post the transaction to your
> Account and your actual balance will be reduced by the amount of the posted
> transaction.

> We use your available balance to determine when your Account is overdrawn.

> The following example illustrates how this works: Assume your actual and
> available balance are both $50, and you use your Debit card at a restaurant for
> $20. If the restaurant requests preauthorization in the amount of $20, an
> authorization hold is placed on $20 in your Account, so your available balance
> is only $30. Your actual balance would remain $50. Before the restaurant
> charge is sent to us for payment, a check that you wrote for $40 clears. Because
> your available balance is only $30 (due to the authorization hold of $20), your
> Account will be overdrawn by $10, even though your actual balance is $50. In
> this case, we may pay the $40 check, but you will be charged a Paid Non-
> Sufficient Funds Fee of $25. That fee will be deducted from your Account,
> further increasing the overdrawn amount.

52.     The Account Agreement also makes clear that such "authorization

holds" endure until the time of posting, therefore confirming such funds cannot be

consumed by other transactions:

> In addition, your available balance may not reflect all of your Debit card
> transactions. For example, if a merchant obtains our prior authorization but
> does not submit a one-time Debit card transaction for payment within three (3)

CLASS ACTION: COMPLAINT

business days of authorization, we must release the authorization hold on the transaction. The available balance will not reflect this transaction once the hold has been released, which generally occurs when the transaction has been received by us and paid from your Account. Refer to the section entitled "Preauthorization Holds" in our Electronic Fund Transfers Agreement and Disclosure below for information about how authorization holds affect your available balance.

53.     Further, the Account Agreement makes clear that overdrafts are determined at the moment of authorization:

If you want the Credit Union to authorize and pay overdrafts for ATM and onetime Debit card transactions, you must provide us with your consent by: (1) visiting any branch and speaking with a Member Service Representative; (2) visiting our website at bpp.aacreditunion.org; or (3) opt-in during the online account opening process.

54.     The Electronic Funds Transfer Agreement also expressly states that authorization holds are placed immediately, and such held funds are off-limits for other transactions:

Preauthorization Holds: When you use your Debit Card at certain merchants such as self-service gas stations, restaurants, hotels, airlines, and rental car companies, the merchant may request a preauthorization hold to cover the final transaction amount. When we preauthorize the transaction, we commit to make the requested funds available when the transaction finally posts and as such, we generally place a temporary hold against some or all of the funds in the Account linked to your Debit card, based on the amount of the preauthorization request from the merchant. We refer to this temporary hold as a "preauthorization hold," and the amount of the preauthorization hold will be subtracted from your available balance as authorization requests are received by us throughout each day. Until the transaction finally settles or we otherwise remove the hold (for example, we may remove the hold because it exceeds the time permitted, as discussed below, or we determine that it is unlikely to be processed), the funds subject to the hold will not be available to you for other purposes. At  some point after you sign for the transaction, it is processed by the merchant and submitted to us for payment…. You may not access funds that are subject to a preauthorization hold. Preauthorization holds may remain on your Account for up to three (3) business days, even after the transaction has been paid.

55.     Of course, when AAFCU then authorizes debit card transactions on

-17-

positive available funds and places an "authorization hold" for the amount of the transaction, not allowing it to be used for anything else, it then violates these Account Contract terms when it later charges OD Fees on such debit card transactions.

56.   This APPN gimmick also breaches AAFCU's second contract at issue, the Regulation E required contract, the Opt-In Contract.  It states, "An overdraft occurs when you do not have enough money available in your checking account to cover a transaction, but we pay it anyway."  When AAFCU therefore engages in the APPN gimmick it is breaching this term since it literally has set-aside the available funds to pay for the transaction at issue when there was "enough money available in [the] checking account to cover [the] transaction," but then may charge an overdraft fee on that transaction regardless.

57.   AAFCU also has an improper practice of charging multiple NSF fees, or an NSF fee followed by an overdraft fee, for the same electronic item.  AAFCU charges a $25 fee when an electronic item is first processed for payment and AAFCU determines that, in its opinion, there is not enough money in the account to cover the item.  AAFCU then charges an *additional* NSF fee, or an overdraft fee following the first NSF fee, if the same item is presented for processing again, even though the account holder took no action to resubmit the transaction for payment.

58.   This charging of more than one fee for the same item breaches AAFCU's Account Agreement.  AAFCU's Account Agreement states at page 5, "We assess **a fee** for each **item** that we either pay, which results in an overdraft, or do not pay, which would have resulted in an overdraft had we paid **it**." (Emphasis added.) (Ex.2 "Account Agreement") In other words, AAFCU uses the singular "a fee" not the plural "multiple fees."  Further, it does not state "per each presentment of an item" but rather states per "item."  AAFCU also does not state that it ever will charge both "an NSF fee **and** an overdraft fee," for an item.  AAFCU then says in its Account Contract to refer to the separate Fee Schedule for a listing of fees, which is

updated periodically.

59.    At all times during the relevant class period in this lawsuit, meaning up until the Fee Schedule dated March 1, 2020, became effective, AAFCU's Fee Schedules were consistent that the charge would be for "each check" or "each ACH transaction" and not "for each presentment of a check" or "each presentment of an ACH transaction"  For example, the Fee Schedule effective in June 2015 states:

| Unpaid Non-Sufficient Funds (NSF) | $25/each |
|---|---|
| Includes NSF & Uncollected Funds on checks, ACH, or other electronic transactions. | |

60.    Further, its Bounce Protection description further underscored this by stating that AA Credit Union charges a $25 fee per item" as follows:

[1] **Bounce Protection** overdraft service is automatically included on our Priority and Flagship Checking accounts. Bounce Protection covers overdrafts that may occur when payments are made via check or automated (ACH) payment when not enough funds are available to cover a transaction. AA Credit Union charges a $25 fee per item returned using this service. Paying the $25 overdraft fee may be a small price to pay for convenience while saving you from the frustration and embarrassment of having an item returned. See our **Rate & Fee Schedule** for more

61.    As can be seen, it states "AA Credit Union charges a $25 fee **per item** returned using this service."  It does not state "AA Credit Union charges a $25 fee **per presentmen**t o**f an item** returned using this service."

62.    Only with its Fee Schedule effective as of March 1, 2020 did AAFCYU change its contractual term to allow itself to charge an NSF fee "per presentment" of the same item, as follows:

| Unpaid Non-Sufficient Funds (NSF) | $25.00 Each |
|---|---|
| Includes NSF & Uncollected Funds, fee imposed per presentment for checks, ACH or other electronic transactions. | |

63.    Prior to that change in contract, AAFCU had contracted to charge the fee "per item" or "per each" item and not "per presentment of the item" or "per retry of the item."  A "re-presentment" or a "retry" of an "item" does not change it into a new or different "item."  It is still the same "item" being presented by the same merchant in the same dollar amount, not a new "item."  An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer,

cannot and does not fairly become a new, unique additional "item" for fee assessment purposes.  Only when its Fee Schedule changing the terms of the contract to each presentment of the item did it arguably contract to charge an NSF Fee for the same item every time it was presented.

64.    Nowhere prior to March 1, 2020, did the Account Agreement or Fee Schedule effective during the class periods state that AAFCU may charge multiple overdraft or NSF fees per item.  The contracts also never have an adjective such as "debit" in front of the word "item" to arguably create an ambiguity against the customer's interpretation.

65.    Of note, many financial institutions that do engage in this same or similar abusive practice of charging repeat NSF fees for the same "item" at least at a minimum make this clear in their Account Agreements, Fee Schedules, or Opt-Ins, unlike Defendant.  They typically use terminology such as "per presentment" or "per each presentment" to make this clear, and often also add far more in explaining this to be sure it not ambiguous.  The following are some examples from other banks and credit unions that make clear what AAFCU was contractually required to do, if it was going to engage in charging multiple $25 NSF fees, or overdraft fees following an NSF fee, for the same item.

66.    Air Academy Federal Credit Union contracts for its NSF fee as follows:

"$25.00 **per presentment**."

*See,* https://www.aafcu.com/fees.html (emphasis added) [last visited on or about March 17, 2020].

67.    Central Pacific Bank contracts unambiguously:

Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $25 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

-20-

CLASS ACTION: COMPLAINT

*See,* https://www.cpb.bank/media/1618/fee-001-rev-10-24-2019-misc-fee-schedule.pdf (emphasis added) [last visited on or about March 17, 2020].

68.    Community Bank, N.A. unambiguously contracts:

**You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned**.

*See,* https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure-FINAL-1.14.2020.pdf (emphasis added) [last visited on or about March 17, 2020].

69.    Delta Community Credit Union contracts unambiguously as follows:

"$30 **per presentment**."

*See,* https://www.deltacommunitycu.com/home/fees.aspx (emphasis added) [last visited on or about March 17, 2020].  Further, in its Account Contract, Delta unambiguously states as follows:

The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account.  **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**.

*See,* https://www.deltacommunitycu.com/home/forms/member-savings-services-disclosures-and-agreements.aspx (emphasis added) [last visited on or about March 17, 2020].

70.    First Financial Bank contracts unambiguously:

Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment).  **Each presentment is considered an item and will be charged accordingly**."

*See,* https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (emphasis added) [last visited on or

CLASS ACTION: COMPLAINT

about March 17, 2020].

71.    First Hawaiian Bank unambiguously contracts:

> You agree that multiple attempts may be made to submit a
> returned item for payment and that multiple fees may be
> charged to you as a result of a returned item and
> resubmission.

*See,*
https://www.fhb.com/en/assets/File/Home_Banking/FHB_Online/Terms_and_Condit
ions_of_FHB_Online_Services_RXP1.pdf (emphasis added) [last visited on or about
March 17, 2020].

72.    First Northern Credit Union unambiguously contracts its NSF fee as,

"$22.00 **per each presentment and any subsequent representment(s)**."

*See,* https://www.fncu.org/feeschedule/?scpage=1&scupdated=1&scorder=-
click_count (emphasis added) [last visited on or about March 17, 2020.

Further, in its Account Contract, First Northern unambiguously contracts as

follows:

> You further agree that **we may charge a NSF fee each
> time an item is presented for payment even if the same
> item is presented for payment multiple times.**  For
> example, if you wrote a check to a merchant who submitted
> the payment to us and we returned the item (resulting in a
> NSF fee), the merchant may re-present the check for
> payment again.  If the second and any subsequent
> presentments are returned unpaid, **we may charge a NSF
> fee for each time we return the item.  You understand
> this means you could be charged multiple NSF fees for
> one check** that you wrote as that check could be presented
> and returned more than once. **Similarly**, if you authorize a
> merchant (or other individual or entity) to electronically
> debit your account, such as an ACH debit, **you understand
> there could be multiple submissions of the electronic
> debit request which could result in multiple NSF fees**

*See,*
(https://www.fncu.org/SecureAsset.aspx?Path=/7/Member_Agreement_November_1
_2019.pdf (emphasis added) [last visited on or about March 17, 2020].

73.    Glendale Federal Credit Union unambiguously contracts its NSF fee as,

CLASS ACTION: COMPLAINT

"$30 **per presentment**."

*See,* https://glendalefcu.org/pdf/fees.pdf (emphasis added) [last visited on or about March 17, 2020].

74.    Klein Bank contracts unambiguously:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee** as provided in this section **regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*See,* https://kleinbankonline.com/bridge/disclosures/ib/disclose.html (emphasis added) [last visited on or about March 17, 2020].

75.    Liberty Financial contracts its NSF fee unambiguously as:

"$27.00 **per presentment**."

*See,* https://liberty.financial/about/fee-schedule/ (emphasis added) [last visited on or about March 17, 2020].

76.    Los Angeles Federal Credit Union contracts its NSF fee unambiguously as:

"$29 **per presentment**."

*See,* https://www.lafcu.org/pdf/currentfees_bus.pdf (emphasis added) [last visited on or about March 17, 2020].

77.    Members First Credit Union contracts unambiguously:

> We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee**

CLASS ACTION: COMPLAINT

**(NSF Fee) if it is presented more than once...we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** [.]

*See,* http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf (emphasis added) [last visited on or about March 17, 2020].

78.    Meriwest Credit Union unambiguously contracts its fee as:

"$35.00/item **per presentment**".

https://www.meriwest.com/sites/www.meriwest.com/files/media/consumer_feesched.pdf (emphasis added) [last visited on or about March 17, 2020].

79.    Partners 1st Federal Credit Union contracts unambiguously:

Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*See,* https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf (emphasis added) [last visited on or about March 17, 2020].

80.    RBC Bank unambiguously contracts:

"We may also charge against the Account an NSF fee for each item returned or rejected, **including for multiple returns or rejections of the same item**."

*See,* https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf (emphasis added) [last visited on or about March 17, 2020].

81.    Regions Bank contracts unambiguously:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient**

-24-

**to pay the item**.

*See,* https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf
(emphasis added) [last visited on or about March 17, 2020].

82.    Tyndall Federal Credit Union lists its NSF fee as:

"$28.00 **per presentment** (maximum 5 per day)."

*See,* https://tyndall.org/member_center/document_center/fee_schedule (emphasis
added) [last visited on or about March 17, 2020].

83.    USE Credit Union contracts unambiguously:

"**Fees are charged per presentment, meaning the same
item is subject to multiple fees if presented for payment
multiple times**."

*See,* https://www.usecu.org/home/Files/static/documents/Schedule_of_Fees.pdf
(emphasis added) [last visited on or about March 17, 2020].

84.    Therefore, if AAFCU wanted to engage in this abusive practice, it was at

least required to state and contract so, as these other financial institutions all do. All

these quotations show that the financial institutions differentiate between an "item"

and a "presentment" of an item when calculating NSF or overdraft fees.  AAFCU did

not use the term "per presentment" in its contract, but instead says it will only charge

a fee "per each."  However, in practice AAFCU charged the fee "per each

presentment of the item" not "per item" as it contracted.  Only on March 1, 2020 did

AAFCU contend it changed its contracts with its members to allow an NSF fee per

presentment:

Unpaid Non-Sufficient Funds (NSF)                    $25.00 Each
Includes NSF & Uncollected Funds, fee imposed per presentment for checks, ACH or other
electronic transactions.

The fact that AAFCU made this addition to its fee schedules, which were otherwise

-25-

CLASS ACTION: COMPLAINT

mainly unchanged from prior fee schedules, shows that it too differentiates between a charge "per item" and a charge "per presentment."

85.     Plaintiff was harmed by Defendant's policy and practice of charging multiple fees on the same item.  It will be necessary to obtain Defendant's records to determine each instance of such wrongful overdraft or NSF fees, but AAFCU breached its contracts with Plaintiff by charging multiple NSF fees on the same item, and by charging an overdraft fee following an NSF fee, at least on the following occasion.  On information and belief, Plaintiff was charged a $25 NSF fee on September 5, 2019 when she tried to make a $5.55 PayPal payment, and it was declined.  Then Plaintiff again was charged an additional $25 fee on September 11, 2019 for this same item $5.55 item when this same item was presented again. AAFCU therefore charged Plaintiff $50 for trying to pay this one $5.55 item.

86.     AAFCU's practice of charging multiple NSF fees, or an overdraft fee following an NSF fee, for a single item is particularly egregious because, as described, AAFCU assesses such fees using an improper APPN calculation which leads to NSF and overdraft fees that should not be assessed at all.  These improper fees lead to a further lowering of the balance and, under AAFCU's policy of charging multiple NSF or overdraft fees on the same item, to additional improper fees compounded upon the first improper fee.

87.     AAFCU's use of the APPN gimmick also has caused it to charge consumers improper $5 transfer fees.  Although according to its Fee Schedule

CLASS ACTION: COMPLAINT

AAFCU is authorized to charge $5 to sweep money from a savings account to a checking account to avoid an overdraft fee which would be otherwise imposed on a member, AAFCU breaches this term by also sweeping money from savings to checking and charging $5 when the sweep does not avoid the overdraft fee, and also sweeping money from savings to checking and charging $5 when no overdraft fee should have been charged regardless of the sweep since the transaction at issue already had been authorized on a positive balance and therefore had funds placed on hold for the specific transaction, thereby not requiring a sweep at the time of posting had AAFCU not been using its APPN accounting gimmick. On August 1, 2019, AAFCU swept $200 from Plaintiff's savings account to her checking account, and charged her $5 for doing that, but this did not avoid any overdraft or NSF fees.  The Fee Schedule did not allow AAFCU to do this if it was not avoiding an overdraft fee. Additionally, a sweep of $30.48 on August 6, 2019, for which AAFCU charged $5, did not prevent AAFCU from assessing an additional $25 overdraft fee for a $6.36 item that posted that day, or another $25 overdraft fee for a $6.69 item that also posted that day.

88.    In conjunction with its improper use of the APPN calculation, this resulted in fees which should not have been charged Plaintiff and class members. Discovery of AAFCU's databases will be required to confirm this.

89.    AAFCU also charged Plaintiff and class members fees not disclosed on its fee schedule or appropriately described as required. 12 CFR § 707.3(a) requires that a credit union like AAFCU make its disclosures pertaining to fees, "…clearly and conspicuously, in writing, and in a form the member or potential member may keep."  Furthermore, 12 CFR Appendix C to Part 707 - Official Staff Interpretations,

is the means by which the staff of the Office of General Counsel of the National Credit Union Administration issues official staff interpretations of Part 707 of the NCUA Rules.  Regarding the Official Staff Interpretation pertaining to this requirement about disclosure of fees, the Official Staff Interpretation requires that the terminology regarding the fees also must be consistent: "3. Consistent terminology. A credit union must use the same terminology to describe terms or features that are required to be disclosed. For example, if a credit union describes a monthly fee (regardless of account activity), as a "monthly service fee" in account opening disclosures, the periodic statements and change-in-terms notices must use the same terminology so that members and potential members can readily identify the fee."  12 CFR Appendix C to Part 707, 707.3(a)3.  Furthermore, these Official Staff Interpretations also require that these, "Disclosures must be presented in a format that allows members and potential members to readily understand the terms of their account." 12 CFR Appendix C to Part 707, 707.3(a) 2.   The descriptions used by AAFCU not only do not even remotely comply with these requirements, but are next to impossible to understand by any reasonable person, and were made even more confusing because they were imposed based on a balance in the account not described by AAFCU as the one which would be used to assess fees.

    90.    On information and belief, the above examples of damages transactions are just a few examples, and Plaintiff believes that Defendant's database will reveal numerous other and different examples of the improper charging of such fees by

Defendant.

91.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.  Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys in or about April 2020.  While Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until about April 2020, because Defendant hid its actual practice from its members by describing a different practice in its contracts.  It also mis-labeled fees and made it next to impossible for a reasonable person to understand which fees applied to which transactions or were authorized, or that Defendant had violated obscure federal laws, including Regulation E.  This not only reasonably delayed discovery, but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop Defendant.

92.    Plaintiff and the class members were harmed by these practices when they were assessed such fees when they should not have been.  A complete evaluation of AAFCU's records is necessary to determine the full extent of Plaintiff's harm from this practice.

## CLASS ACTION ALLEGATIONS

93.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

CLASS ACTION: COMPLAINT

94.     Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following classes:

**Class One:  <u>The APPN Class</u>**

> **All United States residents who have or have had accounts with AAFCU who incurred an overdraft fee on a transaction that was authorized into a positive available balance beginning four years preceding the filing of this Complaint and ending on the day the class certification is granted.**

**Class Two:  <u>The Repeat NSF Class</u>**

> **All United States residents who have or have had accounts with AAFCU who incurred an NSF fee more than once for the same item, or an overdraft fee following an NSF fee for the same item, during the period beginning four  years preceding the filing of this Complaint and ending one day before the effective date of the March 2020 New Fee Schedule.**

**Class Three:  <u>The Regulation E Class</u>**

> **All United States residents who have or have had accounts with AAFCU who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010 and ending on the day the class certification is granted.**

**Class Four:  <u>The Unauthorized Fees Class</u>**

> **All United States residents who have or have had accounts with AAFCU who incurred a fee not authorized by AAFCU's Fee Schedule or Account Agreement, such as a sweep from savings to**

CLASS ACTION: COMPLAINT

**checking which did not avoid an overdraft fee, during the period beginning four  years preceding the filing of this Complaint and ending on the day the class certification is granted.**

95.    Excluded from the Classes are: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class Members.

96.    This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rule of Civil Procedure 23.

97.    **Numerosity** – The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Classes are likely to include thousands of members based on the fact that AAFCU has approximately $7.7 billion in assets and operates approximately 47 branches in 13 states.

98.    Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of AAFCU 's members have been harmed by its practices and thus qualify as Class Members.  Further, the Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group

-31-

to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

99.     **Commonality** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

1.      Whether, pursuant to the Account Agreement, Defendant contracted that it would charge more than one NSF fee for the same item, each time that same item was presented or re-presented;

2.      Whether, pursuant to the Fee Schedule prior to March 2020, Defendant contracted it would charge more than one NSF for the same item, charging an NSF each time the same item was re-presented;

3.      Whether, pursuant to the Account Agreement, Defendant contracted that it would charge an overdraft fee on the same item after already having charged an NSF fee on that same item;

4.      Whether, pursuant to the Fee Schedule prior to March 2020, Defendant disclosed it would charge an overdraft fee on the same item after already having charged an NSF fee on that same item.

5.      Whether the Account Agreement is ambiguous on the issue of whether Defendant would charge an NSF Fee, or an overdraft fee

CLASS ACTION: COMPLAINT

following an NSF fee, every time the same item was presented;

6.    Whether the Fee Schedule prior to March 2020 is ambiguous on the issue of whether Defendant would charge an NSF Fee, or an overdraft fee following an NSF fee, every time the same item was presented;

7.    Whether the Account Agreement contracted for Defendant to charge an overdraft or NSF fee based on an APPN calculation;

8.    Whether the Opt-In Contracted was ambiguous on whether AAFCU would use an APPN calculation for assessing overdraft fees;

9.    Whether Defendant abided by its funds availability policy;

10.    Whether Defendant charged to transfer money from savings to checking when this would not avoid an overdraft or NSF fee;

11.    Whether the contracts are ambiguous on what fees will be charged under what circumstances, or referred to inconsistently;

12.    Whether Defendant complied with Regulation E.

100.    **Typicality** – Plaintiff's claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Account Agreement and Fee Schedules, were identical as to all relevant terms, and also because, *inter alia*, the challenged practices of charging

customers for overdraft fees or NSF fees are uniform for Plaintiff and all Class

Members.  Accordingly, in pursuing her own self-interest in litigating her claims,

Plaintiff will also serve the interests of the other Class Members.

101.   **Adequacy** – Plaintiff will fairly and adequately protect the interests of

the Class Members. Plaintiff has retained competent counsel experienced in class

action litigation to ensure such protection.  There are no material conflicts between

the claims of the representative Plaintiff and the members of the Class that would

make class certification inappropriate.  Plaintiff and her counsel intend to prosecute

this action vigorously.

102.   **Predominance and Superiority** – The matter is properly maintained as

a class action under Federal Rule of Civil Procedure 23(b)(3) because the common

questions of law or fact identified herein and to be identified through discovery

predominate over questions that may affect only individual Class Members.  Further,

the class action is superior to all other available methods for the fair and efficient

adjudication of this matter.  Because the injuries suffered by the individual Class

Members are relatively small, the expense and burden of individual litigation would

make it virtually impossible for Plaintiff and Class Members to individually seek

redress for Defendant's wrongful conduct.  Even if any individual person or group(s)

of Class Members could afford individual litigation, it would be unduly burdensome

to the courts in which the individual litigation would proceed.  The class action

device is preferable to individual litigation because it provides the benefits of unitary

-34-

CLASS ACTION: COMPLAINT

adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

103.   Plaintiff does not believe that any other Class Members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is a desirable forum for this litigation because both Defendant resides in this District. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

104.   Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and

-35-

CLASS ACTION: COMPLAINT

belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

105. This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that:

    a. Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

        1. Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

        2. Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with

respect to the Class as a whole.

b. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

106.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

107.    Plaintiff and each of the Class Members entered into an Account Agreement with Defendant covering the subject of overdraft and NSF transactions. This contract was drafted by and is binding upon Defendant.

108.    Nowhere did the Account Agreement or Opt-In Contract state that AAFCU would sequester money upon authorization for a transaction and not allow it to be used for anything else, but then charge an overdraft fee at the time of the posting of the same transaction when there had been enough money to cover it when sequestered.  Further, nowhere did the Account Agreement or Fee Schedule at issue state that AAFCU would assess an additional NSF fee every time the same electronic item was re-presented for processing or submitted as a "retry."  Also, nowhere did the Account Agreement or Fee Schedule at issue state that AAFCU would assess an overdraft fee following an NSF fee on the same item when the same item was re-

CLASS ACTION: COMPLAINT

presented for processing or submitted as a "retry." AAFCU wrongfully treated a "retry" as a new and separate "item" in violation of the terms of the Account Agreement. This also contradicted its own Fee Schedules prior to the one dated March 2020 which said that an NSF fee or Overdraft fee would be for each item, not for each presentment of an item. Further, in the contracts Defendant promised that it would assess overdraft or NSF fees only when the transaction caused the available balance to fall below zero. Additionally, the operative contracts governed which fees could be charged and under which circumstances, and AAFCU breached these contracts by charging fees under circumstances not permitted by the contracts.

109.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

110.    Defendant breached the express and implied terms of the Account Agreement and Fee Schedules effective prior to March 2020 by, *inter alia*, assessing multiple NSF and overdraft fees for the same electronic item.

111.    As a proximate result of Defendant's breaches, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

112.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

113.    Plaintiff and each of the Class Members entered into contracts with Defendant covering the subject of overdraft transactions, which has been identified herein as the Account Agreement contract which covers overdraft fees and NSF fees, as well as the Fee Schedule. The contracts were drafted by and are binding upon Defendant.

114.    In the contracts, AAFCU promised that it would only assess "a fee" (singular) when it determined a member did not have enough money in his or her account to cover an "item," not "multiple fee**s**" for the same "item." In the Fee Schedule it stated the NSF fee or overdraft fee would be for "each" item, not "per each presentment of an item."  Nowhere in its contracts did Defendant state that it could charge more than one NSF or overdraft fee for a single item.  Further, it did not state it would sequester funds for a transaction and thereby reduce the "available balance" by the amount of sequestered funds, yet potentially charge an overdraft fee at the time of the positing of the transaction despite already having set those funds aside. Nowhere did it state it would charge a $5 fee for sweeping money from savings to checking when this would not avoid a more expensive overdraft fee for the member.

115.    Good faith is an element of every contract.  Whether by common law or

statute, all contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

116.   The material terms of the contracts therefore included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contracts.

117.   Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

118.   Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple overdraft and NSF fees for the same electronic item.  Defendant could easily have avoided acting in this manner by

CLASS ACTION: COMPLAINT

simply changing the programing in its software to charge only an NSF "per item" as its own Fee Schedule stated it would do.  Defendant equally easily could have avoided charging both an overdraft fee following an NSF fee for the same item, and instead charged only an overdraft fee or an NSF fee, as its Account Agreement stated, by simply changing the programing in its software to  charge only one fee or the other for the "item," rather than both fees for the same item.  AAFCU acted in breach of the covenant of good faith and fair dealing when electing to charge an NSF fee followed by a later overdraft fee for the same item, because if it instead had first charged an overdraft fee rather than an NSF fee, the item could not have been re-presented to generate a second fee, since it already would have been paid.  AAFCU also acted in bad faith when after sequestering funds for a particular transaction and not making them available for any other use, nonetheless at the time of posting charging an overdraft fee n that same transaction for which funds already had been set aside. Defendant unilaterally elected to and did program its software to create accounting gimmicks such as this which would maximize its overdraft and NSF fees. In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and the Class Members of the full benefit of the contracts.

119.   As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an

CLASS ACTION: COMPLAINT

amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment/Restitution)

120.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

121.   As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

122.   Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees and repeat NSF and other fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION
### (Money Had and Received)

123.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

124.   Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

CLASS ACTION: COMPLAINT

125.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION
### (Violation of Electronic Fund Transfers Act (Regulation E) C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))

126.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

127.    By charging overdraft fees on ATM and nonrecurring transactions, Defendant violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

128.    Specifically, the charges violated what is known as the "Opt-In Rule" of Reg E.  (12 C.F.R. §1005.17.)  The Opt-In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id*.)  The notice "shall be clear and readily understandable."  (12

CLASS ACTION: COMPLAINT

C.F.R. §205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

129.   The intent and purpose of this Opt-In Contract is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> .... by <u>explaining</u> the institution's overdraft service ... in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E.  *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

130.   AAFCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customer's accounts through an overdraft program for ATM and non-recurring debit card transactions.  AAFCU has failed to comply with the 12

C.F.R. § 1005.17 opt-in requirements, including *inter alia* failing to provide its

customers with a valid description of the overdraft program which meets the

strictures of 12 C.F.R. § 1005.17.  It did not in its Opt-In contract describe in a "clear

and readily understandable way" that it would be using its APPN accounting

gimmick to assess overdraft fees on ATM and debit card transactions.  Further,

AAFCU also used its Opt-In Contract impermissibly as a marketing tool to promote

"Bounce Protection Plus" over "Bounce Protection."

131.   As a result, AAFCU has harmed Plaintiff and the Class.

132.   Due to AAFCU's violation of Regulation E (12 C.F.R. § 1005.17),

Plaintiff and members of the Class are entitled to actual and statutory damages, as

well as attorneys' fees and costs of suit.

## SIXTH CAUSE OF ACTION
**(Violation of Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.*)**
**(On Behalf of the California Members Only)**

133.   The preceding allegations are incorporated by reference and re-alleged

as if fully set forth herein.

134.   AAFCU's conduct described herein violates California's Unfair

Competition Law (the "UCL"), codified as Business and Professions Code section

17200, et seq.  The UCL prohibits and provides civil remedies for unlawful and

unfair competition.  Its purpose is to protect both consumers and competitors by

promoting fair competition in commercial markets for goods and services.  In service

of that purpose, the Legislature framed the UCL's substantive provisions in broad,

sweeping language.  By defining unfair competition to include "any unlawful, unfair

or fraudulent business act or practice," the UCL permits violations of other laws to be

CLASS ACTION: COMPLAINT

treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

135.   The UCL expressly provides for injunctive relief, and also contains provisions denoting its public purpose.  A claim for injunctive relief under the UCL is brought by a plaintiff acting in the capacity of a private attorney general.  Although the private litigant controls the litigation of an unfair competition claim, the private litigant is not entitled to recover compensatory damages for her own benefit, but only disgorgement of profits made by the defendant through unfair or deceptive practices in violation of the statutory scheme or restitution to victims of the unfair competition.

136.   As further alleged herein, AAFCU's conduct violates the UCL's "unfair" prong insofar as AAFCU charges multiple NSF fees on a single item, charges overdraft or NSF fees when there was enough money in the account to cover a transaction, and charges fees that were not listed in either the Account Agreement or Fee Schedule, and also charges fees on transactions for which it previously already had sequestered aside money to cover and made unavailable for other purposes. AAFCU's conduct was not motivated by any legitimate business or economic need or rationale. The harm and adverse impact of AAFCU's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiffs and Class Members arising from AAFCU's unfair practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

137.   Further, with regard to the APPN practice, Plaintiff alleges that conduct already has been found by the Consumer Financial Protection Bureau to be both "unfair" and deceptive:"

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft

status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights".

138.    AAFCU's unfair business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiffs and Class Members, and the general public. AAFCU's conduct was substantially injurious to consumers in that they have been forced to pay improper, abusive, and/or unconscionable NSF, overdraft, and other non-contracted fees.

139.    Moreover, AAFCU's conduct also violates the UCL's unlawful prong. By charging overdraft fees on ATM and nonrecurring transactions, Defendant violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the

protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq.*), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).  Such charges violated what is known as the "Opt-In Rule" of Reg E.  (12 C.F.R. §1005.17.)  The Opt-In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id.*)  The notice "shall be clear and readily understandable."  (12 C.F.R. §205.4(a)(1).)

140.   To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful, and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.  The intent and purpose of this Opt-In Contract is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E.  *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v.*

-48-

*McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

141.   Defendant has violated the unlawful prong of California's UCL as a result of violating Regulation E's prohibitions.

142.   As a result of AAFCU's violations of the UCL, Plaintiffs and Class Members have paid, and/or will pay improper NSF, overdraft, and other non-contracted fees in the future and thereby have suffered actual loss of money and may similarly suffer in the future if the misrepresentations allowed to continue. Absent injunctive relief forcing AAFCU to disgorge itself of its ill-gotten gains and public injunctive relief prohibiting AAFCU from misrepresenting and omitting material information concerning its NSF and overdraft fee policy and other fees policy at issue in this action in the future, Plaintiff and other existing accountholders, and the general public, will suffer from and be exposed to AAFCU's conduct violative of the UCL.

## **PRAYER**

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.     For an order certifying this action as a class action;

2.     For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.     For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.     For statutory damages;

5.     For an order enjoining the wrongful conduct alleged herein;

CLASS ACTION: COMPLAINT

6.    For costs;

7.    For pre-judgment and post-judgment interest as provided by law;

8.    For attorneys' fees under the common fund doctrine, and all other applicable law and sources; and,

9.    For such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

Dated: May 14, 2020                    Respectfully submitted,

THE KICK LAW FIRM, APC

By:    _____/S/ *Taras Kick*_____
Taras Kick, CA Bar No. 143379
Daniel J. Bass, CA Bar No. 287466

WILENTZ, GOLDMAN & SPITZER, P.A.
Kevin P. Roddy, CA Bar No. 128283

KALIEL PLLC
Jeffrey D. Kaliel, CA Bar No. 238293
Sophia G. Gold, CA Bar No.  307971

Attorneys for Plaintiff Sylvia Varga and the Putative Class

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: May 14, 2020                    THE KICK LAW FIRM, APC

By:    _____/S/ *Taras Kick*_____
Taras Kick, CA Bar No. 143379
Daniel J. Bass, CA Bar No. 287466

CLASS ACTION: COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WILENTZ, GOLDMAN & SPITZER, P.A.
Kevin P. Roddy, CA Bar No. 128283

KALIEL PLLC
Jeffrey D. Kaliel, CA Bar No. 238293
Sophia G. Gold, CA Bar No.  307971

Attorneys for Plaintiff Sylvia Varga and the
Putative Class

CLASS ACTION: COMPLAINT