Taras Kick, CA Bar No. 143379
Taras@kicklawfirm.com
Jeffrey C. Bils, CA Bar No. 301629
Jeff@kicklawfirm.com
**THE KICK LAW FIRM, APC**
815 Moraga Drive
Los Angeles, California 90049
Tel: (310) 395-2988 Fax: (310) 395-2088

Kevin P. Roddy, CA Bar No. 128283
kroddy@wilentz.com
**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Tel:  (732) 636-8000 Fax:  (732) 726-6686

Jeffrey D. Kaliel, CA Bar No. 238293
jkaliel@kalielpllc.com
**KALIEL PLLC**
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
Telephone: (202) 350-4783 Fax: (202) 871-8180

Attorneys for Plaintiff
Sylvia Varga and the Putative Class

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SYLVIA VARGA, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN AIRLINES FEDERAL CREDIT UNION, and DOES 1-100,<br><br>Defendants. | **CASE NO.: 2:20-cv-04380-DSF-KS**<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED COMPLAINT FOR**<br><br>(1) Breach of Contract;<br>(2) Breach of the Implied Covenant of Good Faith and Fair Dealing;<br>(3) Money Had and Received and,<br>(4) Violation of the Unfair Competition Laws, Bus. & Prof. Code §17200, *et seq.* |

CLASS ACTION: FIRST AMENDED COMPLAINT

1    Plaintiff Sylvia Varga ("Plaintiff"), by and through her attorneys, hereby brings

2    this class and representative action against American Airlines Federal Credit Union

3    and DOES 1 through 100 (collectively "AAFCU" or "Defendant").

4    **NATURE OF THE ACTION**

5    1.    All allegations herein are based upon information and belief except those

6    allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to

7    Plaintiff or her counsel are based upon, *inter alia*, Plaintiff's or her counsel's personal

8    knowledge, as well as Plaintiff's or her counsel's own investigation.  Furthermore,

9    each allegation alleged herein either has evidentiary support or is likely to have

10    evidentiary support, after a reasonable opportunity for additional investigation or

11    discovery.

12    2.    This is a class and representative action brought by Plaintiff to assert

13    claims in her own right, and in her capacity as the class representative of all other

14    persons similarly situated, and in her capacity as a private attorney general on behalf

15    of the members of the general public.  AAFCU wrongfully charged Plaintiff and the

16    Class Members fees related to their checking accounts.

17    3.    This class action seeks monetary damages, restitution, and injunctive

18    relief due to, *inter alia*, AAFCU's policy and practice to maximize the fees it imposes

19    on members.  The conduct has the overwhelming common denominator of breaching

20    its members' contracts and violating laws so as to maximize AAFCU's fee income.

21    This conduct includes but is not limited to, assessing an overdraft fee or NSF fee on

22    transactions when by Defendant's own calculations there was enough available

23    money in the checking account to cover the transaction at issue when authorized and

24    the money was specifically sequestered for that transaction but would be assessed an

25    overdraft fee anyway; imposing more than one NSF fee, or an NSF fee followed by

26    overdraft fee, on the *same* electronic item or check; charging its members for

27    transferring money from the savings account to the checking account when there was

28

-2-

1   no negative balance, or should not have been a negative balance, to avoid in the

2   checking account; violating its own Funds Availability Policy ("FAP") in a manner

3   which increased fees imposed on members; and, charging for fees not authorized or

4   appropriately disclosed. The charging of such fees breaches AAFCU's contracts with

5   its members, who include Plaintiff and the members of the Class.

6                                    **PARTIES**

7          4.     Plaintiff Sylvia Varga is a resident of Marina del Rey, California and had

8   a checking account with AAFCU at all times relevant to the class action allegations.

9          5.     Based on information and belief, Defendant AAFCU is and has been a

10  federally chartered credit union with its headquarters located in Fort Worth, Texas.

11  AAFCU has assets of more than $7.7 billion, over 310,000 members, and 47

12  branches in 13 states and the District of Columbia.

13         6.     Without limitation, defendants DOES 1 through 100, include agents,

14  partners, joint ventures, subsidiaries and/or affiliates of AAFCU and, upon

15  information and belief, also own and/or operate AAFCU branch locations.  As used

16  herein, where appropriate, the term "AAFCU" is also inclusive of Defendants DOES

17  1 through 100.

18         7.     Plaintiff is unaware of the true names of defendants DOES 1 through

19  100.  Defendants DOES 1 through 100 are thus sued by fictitious names, and the

20  pleadings will be amended as necessary to obtain relief against defendants DOES 1

21  through 100 when the true names are ascertained, or as permitted by law or by the

22  Court.

23         8.     There exists, and at all times herein mentioned existed, a unity of interest

24  and ownership between the named defendants (including DOES) such that any

25  corporate individuality and separateness between the named defendants has ceased,

26  and that the named defendants are *alter egos* in that the named defendants effectively

27  operate as a single enterprise, or are mere instrumentalities of one another.

28

CLASS ACTION: FIRST AMENDED COMPLAINT

9. At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

10. Whenever reference is made in this First Amended Complaint ("Complaint") to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

11. As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## **VENUE AND JURISDICTION**

12. This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) and (6) because:  (i) there are 100 or more class members;  (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs;  and (iii) there is minimal diversity because at least plaintiff and defendant are citizens of different states.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b)(2).

///

///

CLASS ACTION: FIRST AMENDED COMPLAINT

# FACTUAL ALLEGATIONS

**I.      AAFCU Charges OD Fees on Transactions that Do Not Actually Overdraw the Account**

**A. Overview of Claim**

14.     Plaintiff brings this action challenging AAFCU's practice of charging OD Fees on what are referred to in this Complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

15.     Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, AAFCU immediately reduces the consumer's checking account for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because AAFCU has already sequestered these funds for payment.

16.     However, AAFCU still assesses crippling $33 OD Fees on many of these transactions and mispresents its practices in its account documents.

17.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, AAFCU later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

18.     AAFCU maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, AAFCU sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the

CLASS ACTION: FIRST AMENDED COMPLAINT

customer's available balance. Such funds are not available for any other use by the account holder and are specifically associated with a given debit card transaction.

19.   Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

20.   That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those previously authorized debit card transactions.

21.   Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, AAFCU improperly charges OD Fees on APPSN Transactions.

22.   The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated

CLASS ACTION: FIRST AMENDED COMPLAINT

transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

23.    There is no justification for these practices, other than to maximize AAFCU's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But AAFCU is free to protect its interests and either reject those intervening transactions or charge

OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But AAFCU was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APPSN Transactions.

24.     Besides being deceptive, unfair, and unconscionable, these practices breach promises made in AAFCU's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of AAFCU's processes and practices. AAFCU also exploits its contractual discretion by implementing these practices to gouge its customers.

25.     In plain, clear, and simple language, AAFCU's contract promises that AAFCU will only charge OD Fees on transactions that have insufficient funds to cover those transactions.

26.     AAFCU is not authorized to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B. Mechanics of a Debit Card Transaction**

27.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from AAFCU. When a merchant or customer physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to AAFCU, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

28.     At this step, if the transaction is approved, AAFCU immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

29.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

30.     AAFCU (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. After that, AAFCU is obligated to pay the

CLASS ACTION: FIRST AMENDED COMPLAINT

transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that AAFCU may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

31.    There is no change—no impact whatsoever—to the available funds in an account when AAFCU transfers the funds that were previously held.

**C. AAFCU's Account Contract**

32.    American Airlines does not describe this APPSN procedure in its contracts.  Instead, on page 5 of its Account Agreement, Ex. A hereto, AAFCU states as follows: "Overdrawing" your Account means that there are not sufficient available funds in your Account to pay for a transaction, but we pay the transaction anyway."

33.    Page 6 of the Account Agreement also expressly informs accountholders that "authorization holds" are immediately placed on debit card transactions, and that such holds can cause OD or NSF Fees for other, later transactions:

> Your available balance is the amount of money in your Account that is available to you to use without incurring an overdraft fee. The available balance takes into account factors such as holds placed on deposits and pending transactions (such as pending Debit card purchases) that the Credit Union has authorized but that have not yet posted to your Account. For example, assume you have an actual balance of $50 and an available balance of $50. If you were to use your Debit card at a restaurant to buy lunch for $20, then that merchant could ask us to pre-authorize the payment in that amount (or even a different amount). Under this example, if the merchant requested preauthorization in the amount of $20, we will place a "hold" on your Account for $20 (referred to as an "authorization hold"). Your actual balance would still be $50 because this transaction has not yet posted, but your available balance would be $30 because of the restaurant's preauthorization request that resulted in an authorization hold on $20 in your Account. When the restaurant submits its bill

CLASS ACTION: FIRST AMENDED COMPLAINT

for payment (which could be a few days later and for a different amount than the amount of the authorization hold), we will post the transaction to your Account and your actual balance will be reduced by the amount of the posted transaction.

We use your available balance to determine when your Account is overdrawn.

The following example illustrates how this works: Assume your actual and available balance are both $50, and you use your Debit card at a restaurant for $20. If the restaurant requests preauthorization in the amount of $20, an authorization hold is placed on $20 in your Account, so your available balance is only $30. Your actual balance would remain $50. Before the restaurant charge is sent to us for payment, a check that you wrote for $40 clears. Because your available balance is only $30 (due to the authorization hold of $20), your Account will be overdrawn by $10, even though your actual balance is $50. In this case, we may pay the $40 check, but you will be charged a Paid Non-Sufficient Funds Fee of $25. That fee will be deducted from your Account, further increasing the overdrawn amount.

34.     The Account Agreement also makes clear that such "authorization holds" endure until the time of posting, therefore confirming such funds cannot be consumed by other transactions:

In addition, your available balance may not reflect all of your Debit card transactions. For example, if a merchant obtains our prior authorization but does not submit a one-time Debit card transaction for payment within three (3) business days of authorization, we must release the authorization hold on the transaction. The available balance will not reflect this transaction once the hold has been released, which generally occurs when the transaction has been received by us and paid from your Account. Refer to the section entitled "Preauthorization Holds" in our Electronic Fund Transfers Agreement and Disclosure below for information about how authorization holds affect your available balance.

35.     Further, the Account Agreement makes clear that overdrafts are determined at the moment of authorization:

If you want the Credit Union to authorize and pay overdrafts for ATM and

-10-

onetime Debit card transactions, you must provide us with your consent by: (1) visiting any branch and speaking with a Member Service Representative; (2) visiting our website at bpp.aacreditunion.org; or (3) opt-in during the online account opening process.

36.     The Electronic Funds Transfer Agreement, Ex. B hereto, also expressly states that authorization holds are placed immediately, and such held funds are off-limits for other transactions:

Preauthorization Holds: When you use your Debit Card at certain merchants such as self-service gas stations, restaurants, hotels, airlines, and rental car companies, the merchant may request a preauthorization hold to cover the final transaction amount. When we preauthorize the transaction, we commit to make the requested funds available when the transaction finally posts and as such, we generally place a temporary hold against some or all of the funds in the Account linked to your Debit card, based on the amount of the preauthorization request from the merchant. We refer to this temporary hold as a "preauthorization hold," and the amount of the preauthorization hold will be subtracted from your available balance as authorization requests are received by us throughout each day. Until the transaction finally settles or we otherwise remove the hold (for example, we may remove the hold because it exceeds the time permitted, as discussed below, or we determine that it is unlikely to be processed), the funds subject to the hold will not be available to you for other purposes. At some point after you sign for the transaction, it is processed by the merchant and submitted to us for payment…. You may not access funds that are subject to a preauthorization hold. Preauthorization holds may remain on your Account for up to three (3) business days, even after the transaction has been paid.

37.     Lastly, the Overdraft Disclosure, Ex. C, states, "An overdraft occurs when you do not have enough money available in your checking account to cover a transaction, but we pay it anyway."

38.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of a transaction, there are always funds to cover that same transaction—yet AAFCU assesses OD Fees on it anyway.

///

-11-

CLASS ACTION: FIRST AMENDED COMPLAINT

39.     The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions.

40.     In fact, AAFCU actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

41.     The above representations and contractual promises are untrue. In fact, AAFCU charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. Nothing in the Contract authorizes AAFCU to impose OD Fees on APPSN Transactions.

42.     The Contract also misconstrues AAFCU's true debit card processing and overdraft practices.

43.     First, and most fundamentally, AAFCU charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions.

44.     AAFCU assesses OD Fees on APPSN Transactions that do have sufficient funds available to cover them throughout their lifecycle.

45.     AAFCU's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so.

46.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

47.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what AAFCU does when it re-debits the account during a secret batch posting process.

48.     In reality, AAFCU's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time of authorization and later at the time of settlement.

///

CLASS ACTION: FIRST AMENDED COMPLAINT

49.     At the time of settlement, however, an available balance *does not change at all* for transactions previously authorized into positive funds and for which sufficient funds were held. As such, AAFCU cannot then charge an OD Fee on these transactions because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

50.     Upon information and belief, something more is going on: at the moment a debit card transaction is about to settle, AAFCU does something new and unexpected during its middle of the night batch posting process. Specifically, AAFCU releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

51.     This secret step allows it to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which AAFCU specifically set aside money to pay.

52.     This discrepancy between AAFCU's actual practice and the Contract causes consumers like Plaintiff to incur improper and unlawful OD Fees.

53.     In sum, there is a huge gap between AAFCU's practices as described in the account documents and AAFCU's actual practices.

54.     Other banks and credit unions that employ this abusive practice disclose it expressly to their account holders and require them to agree to it—something AAFCU here never did.

55.     Indeed, recognizing the complexity of the settlement process for APPSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, financial institutions generally provide express warnings that APPSN Transactions can incur OD Fees as well as explanations and examples of how such fees occur.

///

-13-

CLASS ACTION: FIRST AMENDED COMPLAINT

56.     For example, Bank of America's deposit agreement states:

Debit card transactions and related authorization holds may impact your available balance. It is important to know that your available funds may change between the time you authorize a transaction and when the transaction is paid. . . . **The amount being held is not applied to the debit card transaction. . . . If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant**. . . .

Here is an example of how that may happen: On Monday we authorize a debit card transaction because you have enough available funds at the time. A hold is then placed on your funds until the merchant presents the transaction for payment. On Tuesday we process and post another transaction (such as a check you wrote) that reduces your available funds below zero. If the merchant presents the original debit card transaction for payment on Wednesday, and your available funds are now below the amount needed to pay the transactions, the debit card transaction will overdraw your account and you may incur an overdraft fee.

*Deposit Agreement and Disclosure*, Bank of America 18 (Nov. 1, 2019), https://www.bankofamerica.com/deposits/resources/deposit-agreements.go (emphasis added).

57.     As another example, Canvas Credit Union states:

Available balance **at the time transactions are posted (not when they are authorized)** may be used to determine when your account is overdrawn.  The following example illustrates how this works:

Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60.  As a result, your available balance will be reduced by $60 so your available balance is only $40.  Your actual balance is still $100.  Before the restaurants charge is sent to us for posting, a check that you wrote for $50 clears.  Because you have only $40 available. . . . your account will be overdrawn by $10, even though your actual balance was $100 before the check posted. . . **Also, when the

$60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, **even though your available balance was positive when it was authorized.**

*Member Service Agreement, Part 2*, Canvas Credit Union 30 (Nov. 5, 2019), https://cdn. canvas.org/files/content/pdf/MSA_Part_2-CanvasCU-Std_Size-11-05-19.pdf (emphases in original).

58.     Capital One's deposit agreement similarly states:

**Other intervening transactions that occur while authorized debit card transactions are pending may create overdrafts on your account.** Here is an example of how that could happen:

You're enrolled in our optional overdraft service. Your account balance is $100.00. On Monday, you go to the store and use your debit card to make a purchase for $80.00. We authorize the transaction; however, the merchant doesn't send us the transaction for payment and posting to your account on that day. On Tuesday, you withdraw $30.00 from an ATM, reducing your account balance to $70. **On Wednesday, the merchant requests payment for the $80.00 transaction authorized on Monday, and you're charged a fee because the balance in your account is insufficient to pay the transaction at that time**.

*Rules Governing Deposit Accounts*, Capital One (Nov. 7, 2018), https://www.capitalone.com/ bank/rules-governing/disclosures/ (emphasis added).

59.     AAFCU provides no such disclosure, and instead makes contractual promises that deceive its account holders.

**D. Plaintiff's Debit Card Transactions**

60.     As examples, on July 19, 2019, July 20, 2019, and August 7, 2019, Plaintiff was assessed OD Fees on debit card transactions, despite the fact that the transactions had been authorized, prior to that day, on a sufficient available balance.

-15-

CLASS ACTION: FIRST AMENDED COMPLAINT

## II.    AAFCU CHARGES TWO OR MORE FEES ON THE SAME ITEM

### A.    Overview of Claim

61.    As alleged more fully herein, AAFCU's operative account documents allow it to take certain steps when a Bank accountholder attempts a transaction but does not have sufficient funds to cover it. Specifically, AAFCU may: (a) authorize the item and charge a single OD Fee; or (b) reject the item and charge a single NSF Fee.

62.    In contrast to its Account Documents, however, AAFCU regularly assesses two or more fees on the same item or transaction.

63.    This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one fee on the same item when it is reprocessed.  Instead, Chase charges one fee, even if a transaction is reprocessed for payment multiple times.

64.    AAFCU never disclosed this practice. To the contrary, AAFCU indicated it will only charge a single fee on an item or per transaction.

### B.    Plaintiff's Experience

65.    As an example, on September 5, 2019, Plaintiff attempted to make a one-time payment ACH payment of $5.55 to Paypal.

66.    AAFCU rejected payment of that item due to insufficient funds and charged Plaintiff a $25 Fee.

67.    Unbeknownst to Plaintiff and without its request to AAFCU to retry the transaction, six later, on September 11, 2019, AAFCU processed the same item again, and again rejected the transaction and again charged Plaintiff a $25 NSF Fee.

68.    In sum, AAFCU charged Plaintiff $50 in fees to process a single payment of less than $6.

69.    Plaintiff understood the transaction to be a single transaction, an understanding consistent with what is laid out in AAFCU's Account Documents,

1    capable at most of receiving a single NSF Fee (if AAFCU returned it) or OD Fee (if

2    AAFCU paid it).

3            70.    AAFCU itself also understood the transaction to be a single transaction.

4        **C.    The Imposition of Multiple Fees on a Single Transaction Violates**

5                **AAFCU's Express Promises and Representations**

6            71.    The Account Documents provide the general terms of Plaintiff's

7    relationship with AAFCU and makes explicit promises and representations regarding

8    how transactions will be processed, as well as when NSF Fees and OD Fees may be

9    assessed.

10           72.    AAFCU's Account Agreement states at page 5, "We assess **a fee** for each

11   **item** that we either pay, which results in an overdraft, or do not pay, which would have

12   resulted in an overdraft had we paid **it**." (Emphasis added.) (Ex.2 "Account

13   Agreement") In other words, AAFCU uses the singular "a fee" not the plural "multiple

14   fees."  Further, it does not state "per each presentment of an item" but rather states per

15   "item."  AAFCU also does not state that it ever will charge both "an NSF fee **and** an

16   overdraft fee," for an item.  AAFCU then says in its Account Contract to refer to the

17   separate Fee Schedule for a listing of fees, which is updated periodically.

18           73.    At all times during the relevant class period in this lawsuit, meaning up

19   until the Fee Schedule dated March 1, 2020, became effective, AAFCU's Fee

20   Schedules were consistent that the charge would be for "each check" or "each ACH

21   transaction" and not "for each presentment of a check" or "each presentment of an

22   ACH transaction"  For example, the Fee Schedule effective in June 2015 states:

| Unpaid Non-Sufficient Funds (NSF) | $25/each |
|---|---|
| Includes NSF & Uncollected Funds on checks, ACH, or other electronic transactions. | |

25           74.    Further, its Bounce Protection description further underscored this by

26    stating that AA Credit Union charges a $25 fee per item" as follows:

27   [1] **Bounce Protection** overdraft service is automatically included on our Priority and Flagship Checking accounts.
     Bounce Protection covers overdrafts that may occur when payments are made via check or automated (ACH)
28   payment when not enough funds are available to cover a transaction. AA Credit Union charges a $25 fee per item
     returned using this service. Paying the $25 overdraft fee will be a small price to pay for convenience while saving
     you from the frustration and embarrassment of having an item returned. See our Rate & Fee Schedule for more

CLASS ACTION: FIRST AMENDED COMPLAINT

75. As can be seen, it states "AA Credit Union charges a $25 fee **per item** returned using this service." It does not state "AA Credit Union charges a $25 fee **per presentmen**t of **an item** returned using this service."

76. Only with its Fee Schedule effective as of March 1, 2020 did AAFCU change its contractual term to allow itself to charge an NSF fee "per presentment" of the same item, as follows:

Unpaid Non-Sufficient Funds (NSF)                    $25.00 Each
Includes NSF & Uncollected Funds, fee imposed per presentment for checks, ACH or other
electronic transactions.

77. Prior to that change in contract, AAFCU had contracted to charge the fee "per item" or "per each" item and not "per presentment of the item" or "per retry of the item." A "re-presentment" or a "retry" of an "item" does not change it into a new or different "item." It is still the same "item" being presented by the same merchant in the same dollar amount, not a new "item." An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique additional "item" for fee assessment purposes. Only when its Fee Schedule changing the terms of the contract to each presentment of the item did it arguably contract to charge an NSF Fee for the same item every time it was presented.

78. The Account Documents contained explicit terms indicating that OD Fees and NSF Fees will only be assessed once per transaction or item, when in fact AAFCU regularly charges two or more fees per transaction or item even though a customer only requested the payment or transfer once.

79. There is zero indication anywhere in the Account Documents that the same item is eligible to incur Multiple Fees.

///

///

-18-

80.     Even if AAFCU reprocesses an instruction for payment, it is still the same item. AAFCU's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

81.     The provisions referenced above never discuss a circumstance where AAFCU may assess multiple fees for a single check or ACH transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

82.     In sum, AAFCU promises that one fee will be assessed per electronic payment or check, and these terms must mean all iterations of the same instruction for payment.  As such, AAFCU breached the contract when it charged more than one fee per item.

83.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same item, which AAFCU will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account.  Nowhere does AAFCU disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor do AAFCU customers ever agree to such fees.

84.     Banks and credit unions like AAFCU that employ this abusive practice know how to plainly and clearly disclose it.  Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their accountholders—something AAFCU never did

85.     Air Academy Federal Credit Union contracts for its NSF fee as follows:
                    "$25.00 **per presentment**."

*See,* https://www.aafcu.com/fees.html (emphasis added) [last visited on or about March 17, 2020].

*///*

CLASS ACTION: FIRST AMENDED COMPLAINT

86.     Central Pacific Bank contracts unambiguously:

> Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $25 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

*See,* https://www.cpb.bank/media/1618/fee-001-rev-10-24-2019-misc-fee-schedule.pdf (emphasis added) [last visited on or about March 17, 2020].

87.     Community Bank, N.A. unambiguously contracts:

> **You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned**.

*See,* https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure-FINAL-1.14.2020.pdf (emphasis added) [last visited on or about March 17, 2020].

88.     Delta Community Credit Union contracts unambiguously as follows:

> "$30 **per presentment**."

*See,* https://www.deltacommunitycu.com/home/fees.aspx (emphasis added) [last visited on or about March 17, 2020].  Further, in its Account Contract, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account.  **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**.

CLASS ACTION: FIRST AMENDED COMPLAINT

*See,* https://www.deltacommunitycu.com/home/forms/member-savings-services-disclosures-and-agreements.aspx (emphasis added) [last visited on or about March 17, 2020].

88.    First Financial Bank contracts unambiguously:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). **Each presentment is considered an item and will be charged accordingly**."

*See,* https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (emphasis added) [last visited on or about March 17, 2020].

89.    First Hawaiian Bank unambiguously contracts:

> You agree that multiple attempts may be made to submit a returned item for payment and that multiple fees may be charged to you as a result of a returned item and resubmission.

*See,* https://www.fhb.com/en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_RXP1.pdf (emphasis added) [last visited on or about March 17, 2020].

90.    First Northern Credit Union unambiguously contracts its NSF fee as,

"$22.00 **per each presentment and any subsequent representment(s)**."

*See,* https://www.fncu.org/feeschedule/?scpage=1&scupdated=1&scorder=-click_count (emphasis added) [last visited on or about March 17, 2020. Further, in its Account Contract, First Northern unambiguously contracts as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is**

-21-

CLASS ACTION: FIRST AMENDED COMPLAINT

**presented for payment multiple times**. For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again. If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item. You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once. **Similarly**, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees**

*See,*

(https://www.fncu.org/SecureAsset.aspx?Path=/7/Member_Agreement_November_1_2019.pdf (emphasis added) [last visited on or about March 17, 2020].

92. Glendale Federal Credit Union unambiguously contracts its NSF fee as, "$30 **per presentment**."

*See,* https://glendalefcu.org/pdf/fees.pdf (emphasis added) [last visited on or about March 17, 2020].

93. Klein Bank contracts unambiguously:

[W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee** as provided in this section **regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment**.

///

-22-

1    *See,* https://kleinbankonline.com/bridge/disclosures/ib/disclose.html (emphasis

2    added) [last visited on or about March 17, 2020].

3          94.    Liberty Financial contracts its NSF fee unambiguously as:

4                 "$27.00 **per presentment**."

5    *See,* https://liberty.financial/about/fee-schedule/  (emphasis added) [last visited on or

6    about March 17, 2020].

7          95.    Los Angeles Federal Credit Union contracts its NSF fee unambiguously

8    as:

9                 "$29 **per presentment**."

10   *See,* https://www.lafcu.org/pdf/currentfees_bus.pdf (emphasis added) [last visited on

11   or about March 17, 2020].

12         96.    Members First Credit Union contracts unambiguously:

13

14             We reserve the right to charge an Non-Sufficient Funds Fee (NSF
               Fee) each time a transaction is presented if your account does not

15             have sufficient funds to cover the transaction at the time of
               presentment and we decline the transaction for that reason. **This**

16             **means that a transaction may incur more than one Non-**

17             **Sufficient Funds Fee (NSF Fee) if it is presented more than**
               **once…we reserve the right to charge a Non-Sufficient Funds**

18             **(NSF Fee) for both the original presentment and the**

19             **representment** [.]

20

21   *See,*

22   http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agree

23   ment.pdf (emphasis added) [last visited on  or about March 17, 2020].

24         97.    Meriwest Credit Union unambiguously contracts its fee as:

25                "$35.00/item **per presentment**".

26   https://www.meriwest.com/sites/www.meriwest.com/files/media/consumer_feesched.

27   pdf (emphasis added) [last visited on or about March 17, 2020].

28   *///*

-23-

98.   Partners 1ˢᵗ Federal Credit Union contracts unambiguously:

> Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*See,* https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf (emphasis added) [last visited on or about March 17, 2020].

99.   RBC Bank unambiguously contracts:

> "We may also charge against the Account an NSF fee for each item returned or rejected, **including for multiple returns or rejections of the same item**."

*See,* https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf (emphasis added) [last visited on or about March 17, 2020].

100.   Regions Bank contracts unambiguously:

> If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**.

*See,* https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf (emphasis added) [last visited on or about March 17, 2020].

101.   Tyndall Federal Credit Union lists its NSF fee as:

> "$28.00 **per presentment** (maximum 5 per day)."

///

-24-

*See,* https://tyndall.org/member_center/document_center/fee_schedule (emphasis added) [last visited on or about March 17, 2020].

102.   USE Credit Union contracts unambiguously:

"**Fees are charged per presentment, meaning the same item is subject to multiple fees if presented for payment multiple times**."

*See,* https://www.usecu.org/home/Files/static/documents/Schedule_of_Fees.pdf (emphasis added) [last visited on or about March 17, 2020].

103.   Plaintiff and the class members were harmed by these practices when they were assessed such fees when they should not have been.  A complete evaluation of AAFCU's records is necessary to determine the full extent of Plaintiff's harm from this practice.

## CLASS ACTION ALLEGATIONS

104.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

105.   Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following classes:

**Class One:  The APPSN Class**

**All United States residents who have or have had accounts with AAFCU who incurred an overdraft fee on a debit card transaction that was authorized into a positive available balance beginning four years preceding the filing of this Complaint and ending on the day the class certification is granted.**

///

CLASS ACTION: FIRST AMENDED COMPLAINT

**Class Two:  <u>The California APPSN Sub-Class</u>**

> **All California citizens who have or have had accounts with AAFCU who incurred an overdraft fee on a debit card transaction that was authorized into a positive available balance beginning four years preceding the filing of this Complaint and ending on the day the class certification is granted.**

**Class Three:  <u>The Repeat NSF Class</u>**

> **All United States residents who have or have had accounts with AAFCU who incurred an NSF fee more than once for the same item, or an overdraft fee following an NSF fee for the same item, during the period beginning four  years preceding the filing of this Complaint and ending one day before the effective date of the March 2020 New Fee Schedule.**

**Class Four:  <u>The California Repeat NSF Sub-Class</u>**

> **All California citizens who have or have had accounts with AAFCU who incurred an NSF fee more than once for the same item, or an overdraft fee following an NSF fee for the same item, during the period beginning four  years preceding the filing of this Complaint and ending one day before the effective date of the March 2020 New Fee Schedule.**

106.   Excluded from the Classes are: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class Members.

107.   This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rule of Civil Procedure 23.

///

CLASS ACTION: FIRST AMENDED COMPLAINT

108.   **Numerosity** – The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Classes are likely to include thousands of members based on the fact that AAFCU has approximately $7.7 billion in assets and operates approximately 47 branches in 13 states.

109.   Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of AAFCU 's members have been harmed by its practices and thus qualify as Class Members.  Further, the Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

110.   **Commonality** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

a.   Whether, pursuant to the Account Agreement, Defendant contracted that it would charge more than one NSF fee for the same item, each time that same item was presented or re-presented.

b.   Whether, pursuant to the Fee Schedule prior to March 2020, Defendant contracted it would charge more than one NSF for the same item, charging an NSF each time the same item was re-presented;

c.   Whether, pursuant to the Account Agreement, Defendant contracted that it would charge an overdraft fee on the same item after already

-27-

having charged an NSF fee on that same item;

d.      Whether, pursuant to the Fee Schedule prior to March 2020, Defendant disclosed it would charge an overdraft fee on the same item after already having charged an NSF fee on that same item.

e.      Whether the Account Agreement is ambiguous on the issue of whether Defendant would charge an NSF Fee, or an overdraft fee following an NSF fee, every time the same item was presented;

f.      Whether the Fee Schedule prior to March 2020 is ambiguous on the issue of whether Defendant would charge an NSF Fee, or an overdraft fee following an NSF fee, every time the same item was presented;

g.      Whether the Account Agreement contracted for Defendant to charge an overdraft or NSF fee based on an APPSN calculation;

h.      Whether the Overdraft Disclosureed was ambiguous on whether AAFCU would use an APPSN calculation for assessing overdraft fees;

i.      Whether the contracts are ambiguous on what fees will be charged under what circumstances, or referred to inconsistently.

111.    **Typicality** – Plaintiff's claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Account Agreement and Fee Schedules, were identical as to all relevant terms, and also because, *inter alia*, the challenged practices of charging customers for overdraft fees or NSF fees are uniform for Plaintiff and all Class Members.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

112.    **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class

CLASS ACTION: FIRST AMENDED COMPLAINT

1   action litigation to ensure such protection.  There are no material conflicts between

2   the claims of the representative Plaintiff and the members of the Class that would

3   make class certification inappropriate.  Plaintiff and her counsel intend to prosecute

4   this action vigorously.

5       113.  **Predominance and Superiority** – The matter is properly maintained as

6   a class action under Federal Rule of Civil Procedure 23(b)(3) because the common

7   questions of law or fact identified herein and to be identified through discovery

8   predominate over questions that may affect only individual Class Members.

9   Further, the class action is superior to all other available methods for the fair and

10  efficient adjudication of this matter.  Because the injuries suffered by the individual

11  Class Members are relatively small, the expense and burden of individual litigation

12  would make it virtually impossible for Plaintiff and Class Members to individually

13  seek redress for Defendant's wrongful conduct.  Even if any individual person or

14  group(s) of Class Members could afford individual litigation, it would be unduly

15  burdensome to the courts in which the individual litigation would proceed.  The

16  class action device is preferable to individual litigation because it provides the

17  benefits of unitary adjudication, economies of scale, and comprehensive

18  adjudication by a single court.  In contrast, the prosecution of separate actions by

19  individual Class Members would create a risk of inconsistent or varying

20  adjudications with respect to individual Class Members that would establish

21  incompatible standards of conduct for the party (or parties) opposing the Class and

22  would lead to repetitious trials of the numerous common questions of fact and law.

23  Plaintiff knows of no difficulty that will be encountered in the management of this

24  litigation that would preclude its maintenance as a class action.  As a result, a class

25  action is superior to other available methods for the fair and efficient adjudication of

26  this controversy.  Absent a class action, Plaintiff and the Class Members will

27  continue to suffer losses, thereby allowing Defendant's violations of law to proceed

28

CLASS ACTION: FIRST AMENDED COMPLAINT

1    without remedy and allowing Defendant to retain the proceeds of their ill-gotten

2    gains.

3        114.   Plaintiff does not believe that any other Class Members' interest in

4    individually controlling a separate action is significant, in that Plaintiff has

5    demonstrated above that her claims are typical of the other Class Members and that

6    she will adequately represent the Class.  This particular forum is a desirable forum

7    for this litigation because both Defendant resides in this District. Plaintiff does not

8    foresee significant difficulties in managing the class action in that the major issues

9    in dispute are susceptible to class proof.

10       115.   Plaintiff anticipates the issuance of notice, setting forth the subject and

11   nature of the instant action, to the proposed Class Members.  Upon information and

12   belief, Defendant's own business records and/or electronic media can be utilized for

13   the contemplated notices.  To the extent that any further notices may be required,

14   Plaintiff anticipates the use of additional media and/or mailings.

15       116.   This matter is properly maintained as a class action pursuant to Rule

16   23(b) of the Federal Rules of Civil Procedure in that:

17           a.      Without class certification and determination of declaratory,

18       injunctive, statutory and other legal questions within the Class format,

19       prosecution of separate actions by individual members of the Class will create

20       the risk of:

21               (1)     Inconsistent or varying adjudications with respect to

22           individual members of the Class which would establish incompatible

23           standards of conduct for the parties opposing the Class; or

24               (2)     Adjudication with respect to individual members of the

25           Class, which would as a practical matter be dispositive of the interests of

26           the other members not parties to the adjudication or substantially impair

27           or impede their ability to protect their interests. The parties opposing the

28

-30-

Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

   b.  Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy.

<strong><u>FIRST CAUSE OF ACTION</u></strong>

<strong><u>BREACH OF CONTRACT INCLUDING THE COVENANT</u></strong>

<strong><u>OF GOOD FAITH AND FAIR DEALING</u></strong>

<strong>(On behalf of the APPSN Class and Repeat NSF Fee Classes)</strong>

117. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

118. Plaintiff and AAFCU contracted for checking account and debit card services, as embodied in the Account documents.

119. AAFCU breached the contract when it charged overdraft fees on APPSN transactions and when it assessed multiple NSF Fees on the same item.

120. Plaintiff and members of the putative Class have performed all of the obligations on them pursuant to the Consumer Account Agreement.

121. Plaintiff and members of the putative Class have sustained monetary damages as a result of Defendant' breach.

122. Under the laws of the State of California where AAFCU does business, good faith is an element of every contract.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are

-31-

mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

123.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

124.   AAFCU breached the covenant of good faith and fair dealing in its Consumer Account Agreement through its OD and NSF Fee policies and practices as alleged herein. Specifically, AAFCU's Consumer Account Agreement misrepresents to accountholders the true nature of AAFCU's assessment of its OD and NSF Fees.

125.   Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Account Documents.

126.   Plaintiff and members of the Classes have sustained damages as a result of AAFCU's breach of the contract and the covenant of good faith and fair dealing.

**SECOND CAUSE OF ACTION**

**(Money Had and Received)**

**(On behalf of the APPSN Class and Repeat NSF Fee Classes)**

127.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

128.   Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

129.   As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded

-32-

1  to Plaintiff and the Class Members.  Therefore, Plaintiff and the Class Members seek
2  relief as set forth in the Prayer below.

3  <u>**THIRD CAUSE OF ACTION**</u>

4  **(Violation of Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq*.)**
5  **(On Behalf of the California APPSN Sub-Class and California Repeat NSF Fee**
6  **Sub-Class)**

7  130.   The preceding allegations are incorporated by reference and re-alleged
8  as if fully set forth herein.

9  131.   AAFCU's conduct described herein violates California's Unfair
10 Competition Law (the "UCL"), codified as Business and Professions Code section
11 17200, et seq.  The UCL prohibits and provides civil remedies for unlawful and
12 unfair competition.  Its purpose is to protect both consumers and competitors by
13 promoting fair competition in commercial markets for goods and services.  In service
14 of that purpose, the Legislature framed the UCL's substantive provisions in broad,
15 sweeping language.  By defining unfair competition to include "any unlawful, unfair
16 or fraudulent business act or practice," the UCL permits violations of other laws to be
17 treated as unfair competition that is independently actionable, and sweeps within its
18 scope acts and practices not specifically proscribed by any other law.

19 132.   The UCL expressly provides for injunctive relief, and also contains
20 provisions denoting its public purpose.  A claim for injunctive relief under the UCL is
21 brought by a plaintiff acting in the capacity of a private attorney general.  Although
22 the private litigant controls the litigation of an unfair competition claim, the private
23 litigant is not entitled to recover compensatory damages for her own benefit, but only
24 disgorgement of profits made by the defendant through unfair or deceptive practices
25 in violation of the statutory scheme or restitution to victims of the unfair competition.

26 133.   As further alleged herein, AAFCU's conduct violates the UCL's
27 "unfair" prong insofar as AAFCU charges multiple NSF fees on a single item,

28

-33-

CLASS ACTION: FIRST AMENDED COMPLAINT

charges overdraft or NSF fees when there was enough money in the account to cover a transaction, and charges fees that were not listed in either the Account Agreement or Fee Schedule, and also charges fees on transactions for which it previously already had sequestered aside money to cover and made unavailable for other purposes. AAFCU's conduct was not motivated by any legitimate business or economic need or rationale. The harm and adverse impact of AAFCU's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiffs and Class Members arising from AAFCU's unfair practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

134.    Further, with regard to the APPSN practice, Plaintiff alleges that conduct already has been found by the Consumer Financial Protection Bureau to be both "unfair" and deceptive:"

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.  Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above.  Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged.  Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions.  Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status.  But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the

-34-

overall net impression created by the disclosures.  Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive.  Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

135.    Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights".  AAFCU's unfair business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiffs and Class Members, and the general public.  AAFCU's conduct was substantially injurious to consumers in that they have been forced to pay improper, abusive, and/or unconscionable NSF, overdraft, and other non-contracted fees.

136.    Moreover, AAFCU's conduct also violates the UCL's unlawful prong.  By charging overdraft fees on ATM and nonrecurring transactions, Defendant violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).  Such charges violated what is known as the "Opt-In Rule" of Reg E.  (12 C.F.R. §1005.17.)  The Opt-In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id*.)  The notice "shall be clear and readily

-35-

CLASS ACTION: FIRST AMENDED COMPLAINT

1    understandable." (12 C.F.R. §205.4(a)(1).)

2         137. To comply with the affirmative consent requirement, a financial

3    institution must provide a segregated description of its overdraft practices that is

4    accurate, non-misleading and truthful, and that conforms to 12 C.F.R. § 1005.17 prior

5    to the opt-in, and must provide its customers a reasonable opportunity to opt-in after

6    receiving the description. The affirmative consent must be provided in a way

7    mandated by 12 C.F.R. § 1005.17, and the financial institution must provide

8    confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. The

9    intent and purpose of this Overdraft Disclosure is to "assist customers in

10    understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> .... by

11    <u>explaining</u> the institution's overdraft service ... in a <u>clear and readily understandable</u>

12    <u>way</u>"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035,

13    59037, 5940, 5948), which is "the CFPB's official interpretation of its own

14    regulation," "warrants deference from the courts unless 'demonstrably irrational,'"

15    and should therefore be treated as "a definitive interpretation" of Reg E. *Strubel v.*

16    *Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016)

17    (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the

18    CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

19         138. Defendant has violated the unlawful prong of California's UCL as a

20    result of violating Regulation E's prohibitions.

21         139. As a result of AAFCU's violations of the UCL, Plaintiffs and Class

22    Members have paid, and/or will pay improper NSF, overdraft, and other non-

23    contracted fees in the future and thereby have suffered actual loss of money and may

24    similarly suffer in the future if the misrepresentations allowed to continue. Absent

25    injunctive relief forcing AAFCU to disgorge itself of its ill-gotten gains and public

26    injunctive relief prohibiting AAFCU from misrepresenting and omitting material

27    information concerning its NSF and overdraft fee policy and other fees policy at issue

28

CLASS ACTION: FIRST AMENDED COMPLAINT

in this action in the future, Plaintiff and other existing accountholders, and the general public, will suffer from and be exposed to AAFCU's conduct violative of the UCL.

## **PRAYER**

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.     For an order certifying this action as a class action;

2.     For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.     For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.     For statutory damages;

5.     For an order enjoining the wrongful conduct alleged herein;

6.     For costs;

7.     For pre-judgment and post-judgment interest as provided by law;

8.     For attorneys' fees under the common fund doctrine, and all other applicable law and sources; and,

9.     For such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff and the Class Members demand a trial by jury on all issues so triable.


Dated: August 25, 2020                    Respectfully submitted,

                                          _____/S/ *Taras Kick*_____
                                          Taras Kick, CA Bar No. 143379
                                          Jeffrey C. Bils, CA Bar No. 301629
                                          **THE KICK LAW FIRM, APC**
                                          815 Moraga Drive
                                          Los Angeles, California 90049
                                          Telephone: (310) 395-2988
                                          Facsimile: (310) 395-2088
                                          Taras@kicklawfirm.com

-37-

CLASS ACTION: FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kevin P. Roddy, CA Bar No. 128283
**WILENTZ, GOLDMAN & SPITZER, P.A.**
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:  (732) 726-6686
kroddy@wilentz.com

Jeffrey D. Kaliel, CA Bar No. 238293
Sophia G. Gold, CA Bar No.  307971
**KALIEL PLLC**
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielplllc.com

Attorneys for Plaintiff Sylvia Varga and the
Putative Class

-38-